## · CHARLESTON.

GEORGE B. KESTERSON *et al.* v. HAGER KESTERSON *et als.*

(No. 5683)

Submitted October 5, 1926.   Decided October 12, 1926.

APPEAL AND ERROR—*Where Vital Issue Depends on Conflicting Depositions, Decree of Trial Chancellor Will Not be Disturbed, Although Appellate Court Might Have Pronounced Different Decree Had it First Decided Issue.*

Where the vital issue in a chancery cause is the establishment of a verbal agreement of partnership, and the determination thereof depends upon depositions of such conflicting and unsatisfactory nature that different judges might draw different conclusions therefrom, a decree of the trial chancellor will not be disturbed by the appellate court, although it might have pronounced a different decree had it first decided the issue.

(Appeal and Error, 4 C. J. §§ 2868, 2869.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of Syllabi.)

Appeal from Circuit Court, Wood County.

Suit by George B. Kesterson and others against Hager Kesterson and others, for dissolution and settlement of partnership affairs and the appointment of a receiver pending the settlement. From a decree dismissing the bill without prejudice, plaintiffs appeal.

*Affirmed.*

*F. P. Moats* for appellants.

*Smith D. Turner* and *R. B. McDougle* for appellee Hager Kesterson.

LIVELY, JUDGE:

Plaintiffs, George B. Kesterson and W. F. Bridges, filed their bill against defendant Hager Kesterson, asserting that they were equal partners with him in the property and business of Kesterson Ice Company, and praying for a dissolution and settlement of the partnership affairs and the appointment of a receiver pending the settlement. Defendant answered denying the alleged partnership, asserting that he was the sole owner of the Kesterson Ice Company, and admitting that he owed money to each of the plaintiffs which he had borrowed from them. The parties went to proof. The chancellor found there was no partnership and dismissed the bill without prejudice to the right of plaintiffs, respectively, to take such proceedings as they might be advised to recover from defendant such sums as they claimed to have contributed to the alleged partnership.

The error alleged against the decree is that the evidence impels a different conclusion. Plaintiffs say the evidence and circumstances establish the fact of a partnership; while defendant asserts the contrary. This, the only assignment of error, impels consideration of the evidence, and depends upon the weight to be given the testimony of witnesses and their credibility, together with a consideration of the situation of the parties and the surrounding circumstances.

The contract of partnership was verbal, according to plaintiffs' contention, and each partner was to put into it whatever sums he was able to raise, and after the debts were paid, then each partner should be repaid whatever sums he had contributed, and then they should be equal and share alike in the property and profits. Have the plaintiffs established the verbal agreement? The burden is on them to do so. It is not the purpose of this opinion to detail the great mass of evidence. Much of it is contradictory. Plaintiffs in their own testimony contradict themselves in some instances, and are contradicted by other witnesses. On the other hand, defendant is contradicted by plaintiffs and some of their witnesses. It is a family controversy; and as is usual in such

instances, the immediate relatives take sides, and it is diffi-
cult to reconcile their conflicting evidence and accord the
proper weight thereto, involving, as it does, credibility. To
detail the evidence tending to establish controverted facts
would be of little use for guidance in other cases.

Hager Kesterson and W. F. Bridges, his brother-in-law,
in the year 1922, were engaged in retailing ice in the City of
Parkersburg, each carrying on a separate business and pur-
chasing their ice from the National Cold Storage Company,
an ice manufacturer in the city. Hager had been in the
business practically all his life except when he was overseas
in the world war. He had accumulated about 13 horses and
mules, with harness and other equipment for delivering ice
to his customers, including 12 delivery wagons, all of which
he says was worth $6,000.00, not including his "going concern
value". Bridges, a brother-in-law, and George Kesterson
(plaintiffs), the latter a brother of Hager, say this equipment
was not worth over $600.00. He made out of his retail busi-
ness that year, $8000.00 net. His trade name was The Kes-
terson Ice Company. Bridges had a delivery route outside
of the city and had a small equipment not important in value.
Sometime in the later part of that year Hager and Bridges
learned that the cold storage company had been purchased
by a competitor, from whom they could not purchase ice for
retail. Their contract with the cold storage company ended
in March, 1923. Hager owned two lots in the city, the Hill-
eary lot which he had purchased for about $4,000.00, on
which he had paid $1,000.00; and another lot purchased in
1922 from the R. Logan Securities Company, on which, in
Nov. 1922, he erected a garage building at a cost of $7,000.00,
which has been used since to house the horses and equipment
of the Kesterson Ice Company. Bridges owned and tilled a
farm near Parkersburg which he valued at from fifteen to
twenty thousand dollars, and on which he had given a trust
deed for $1,600.00. George Kesterson was engaged in buying
and selling cattle, horses and furs, had saved about $2,000.00
in cash, and owned property in the city.

It is the contention of plaintiffs that in the fall of 1922, when it was learned that the source of supply of ice would be cut off, the alleged partnership was formed for the purpose of putting up an ice manufactory in order to keep Hager and Bridges in business. On January 25, 1923, Hager purchased machinery for making ice, obligating himself to pay therefor approximately $20,000.00. · On February 6, 1923, he broke ground and began the erection of the house for the plant on the Hilleary lot, having borrowed $5,000.00 from a bank, securing payment thereof by deed of trust on his garage lot. It appears that he had made arrangements with a Mr. Dyke for the loan of $15,000.00 to pay on the machinery, and when the time came for making payment, Dyke refused the loan. On April 6, 1923, Bridges executed a deed of trust on his farm to secure payment to Flynn and Bee the sum of $5,500.00 represented by a note at three months, signed by Bridges and wife payable to Hager and endorsed by him. The proceeds of this note, after paying the prior deed of trust for about $1,600.00 given by Bridges, and a heavy bonus to Flynn and Bee, were used in paying for the machinery. The proceeds of this note amounted to about $3,400.00, and is the amount which Bridges claims he contributed to the alleged partnership under the agreement made the preceding fall. Hager says that this sum was borrowed by him from Bridges while in stress from the failure of Dyke to keep his promise, that he paid a bonus of $500.00 to Flynn and Bee for going security on the note payable to him and endorsed by him to them; and that Bridges was to get ice from him at a discount of 33-1/3% from the wholesale price to continue his, Bridges', retail business. It appears that Bridges did continue to conduct his retail business and did get ice from the plant, when it was constructed, at 33-1/3% less than the wholesale price.

Later on, in June 1923, George Kesterson turned over to Hager $2,000.00. Previous to that time, in March, 1923, George had endorsed a note in the bank for Hager in the amount of $2,000.00 to finish paying for the garage building. The bank was insisting on payment, and Hager says he bor-

rowed this $2,000.00 in June, for the purpose of paying off that note, and the money was used for that purpose, and that he gave George his note therefor at 10% interest on which he had paid $400.00 at the time the depositions were given. George says this money was contributed by him for the partnership and is the amount of money which he contributed, and was held by him until the machinery was installed, and was paid on the machinery debt. He says he was not to put his money in the venture until the machinery was installed and it began to produce ice. George says no note was given, and that the $400.00 was loaned him for the purpose of buying furs, and was to be repaid.

On April 19, 1923, Minnie Kesterson endorsed Hager's note for $3,000.00 at another bank and this money was used in building the plant; later on June 20, 1923, Myrtle Bridges (wife of plaintiff Bridges, and sister of Hager), loaned Hager $500.00 for which he gave her his note, which sum went into the plant.

On June 15, 1923, the plant began producing ice. Hager had bought ice at wholesale from an out-of-town producer between April 15th and the time the plant began making ice, and the retail business was conducted as before in the name of the Kesterson Ice Company. After the plant was constructed, the business progressed profitably. Bridges conducted his retail business as before, purchasing ice from the Kesterson Ice Company at 33-1/3% below the market price. He worked at the plant as chief engineer at $30.00 a week and received that sum for the time he worked. George Kesterson also worked at the plant in busy times as a laborer and was paid $4.00 per day. Hager employed and discharged the workmen and made all contracts, purchases, payments, and kept the books. There appears to have been nothing said as to what he should receive for his services, or for the use of his garage building, and it does not appear what amount of money was actually used by him for personal expenses. No statement was ever made or asked as between the alleged partners as to profits or loss.

In 1923, the business had grown, and it was determined to build a cold storage to meet demands for ice in the hot weather, and a loan of $20,000.00 was negotiated by Hager at the Union Deposit and Trust Company secured by a deed of trust on the plant, which money was used to pay the Minnie Kesterson note of $3,000.00, about $5,000.00 on the machinery, and the remainder in building the cold storage. In that deed of trust the following is found:

"It is also stipulated therein that while the property herein conveyed stands upon the records of Wood County, West Virginia, in the name of Hager Kesterson the said G. B. Kesterson and W. F. Bridges and wife, join in this deed of trust for the purpose of conveying any equitable interest they may have, or to which they may be entitled in the said property, hereby conveyed."

In March, 1925, the last renewal of the Flynn and Bee note secured by trust deed on Geo. Kesterson's farm became due. This debt had become burdensome because of the heavy bonus required by the lenders at each renewal, and Hager desired to increase the loan of $20,000.00 in the Union Trust and Deposit Company up to $25,000.00 in order to pay off the balance of the Flynn and Bee note, and also to pay the George Kesterson debt of about $2,000.00. The banker, Mr. Neal, having investigated the conduct of the business and received statements thereof showing assets and liabilities, and, noting the success of the business, agreed to increase the loan, but in view of the stipulation in the existing $20,000.00 deed of trust above quoted, requiring that George Kesterson and Bridges and wife should execute a release of their supposed interest in the Kesterson Ice Company. Upon presentation to them of such release, they refused to sign, claiming that they were equal partners under the verbal contract. They were then discharged from employment at the plant, and Hager refused to further sell ice to Bridges, except at the wholesale price. This suit followed.

These are the main facts, established largely by the trust deeds, notes and contract for the purchase of the machinery purchased in Hager's name. Plaintiffs say that all this was

done in pursuance of the verbal agreement made in the fall
of 1922, and that they put in the money contributed by them
($3,400.00 by Bridges and $2,000.00 by George) in pursuance
of that agreement, and pledged their credit by way of en-
dorsements in further pursuance of their agreement.

We can see nothing in these transactions which impel the
conclusion of a partnership. The stipulation in the deed of
trust above quoted is the only written evidence which would
import a partnership. The other documentary evidence is
not inconsistent with the relation of debtor and creditor. To
establish the agreement and its terms (that each should con-
tribute what funds he could, and after payment of debts, the
repayment of the contributions, then they would share and
share alike), we must look to the verbal testimony. As above
suggested, this evidence is conflicting and unsatisfactory. The
chancellor has weighed this evidence and found it wanting in
probity and force to establish the alleged agreement. There
are many circumstances in the handling of the affairs and
the building of the plant which go to repel the existence of a
partnership. Some of them are: The fact that the business
was conducted in the name of Kesterson Ice Company, a trade
name, which had been used by Hager long before the alleged
agreement. No change in name. (It may be stated here that
another brother of Hager was interested in the business until
the winter of 1923, long after the alleged agreement, when he
sold out to Hager, and he says he never heard of any claim
of interest in his business on the part of plaintiffs. This is
only one instance of the many contradictions). Again, Hager
purchased the machinery in his own name, after the alleged
agreement. He insured the property for his own benefit, and
employed and discharged the workmen, including the plain-
tiffs. No inventory was made of the property owned by the
Kesterson Ice Company when the alleged agreement was
made, nor at any other time. Plaintiffs were paid wages
agreed upon, and no compensation was agreed upon for
Hager. The garage building was erected by Hager on his lot,
in which the horses and wagons were always kept, and no
agreement was made as to what he should receive therefor.

No value was placed on Hager's business as a going concern. Bridges, although he claims he was to put all he could into the partnership, continued to conduct his ice business as before, getting his ice below the wholesale market price. It may be observed here that none of the employees at the plant had ever heard that plaintiffs were interested therein except as company employees with them. Hager ran the business. These are circumstances which militate against a partnership.

A contract of partnership need not be in writing. It may be shown by the acts of the partners, from their relations, and the way they have dealt with their respective properties. The intention of the parties may be obtained in this way. *Setzer* v. *Beale,* 19 W. Va. 274. No intention to form a partnership can be reasonably drawn from the way the business was conducted. It rather negatives such intention.

The stipulation in the deed of trust above quoted, on its face imports that plaintiffs were interested in the property of the company offered to the banker as security for the loan of $20,000.00. The evidence of Mr. Neal is to the effect that Hager came to him for the loan, and made a written statement of his assets and liabilities, including the amount received from Bridges and secured by deed of trust on the latter's farm, and the amount owing to George Kesterson, about $2,000.00. He directed his attorney, Judge Forrer, to prepare a deed of trust and make George Kesterson and Bridges parties thereto, so there could be no ''flare-back''. Hager says he did not read the trust deed and was not aware that such a stipulation was contained therein. The stipulation does not say that plaintiffs have any interest in the property. It is to cover any interest they might have therein, and no doubt was a precaution inspired by the prudent banker and for his benefit. He says so. Bankers generally want all the security they can possibly obtain. We do not think this stipulation; the presence of which is explained by the banker and Judge Forrer, is sufficient to impel the conclusion of the partnership agreement as claimed.

Plaintiffs say the various steps taken in the establishment of the business were done by their joint concurrence and advice. Hager denies that he consulted with them.

This case turns upon the establishment of a fact, based upon evidence extremely unsatisfactory and conflicting. The evidence is inconclusive, depending as it does upon the credibility of the witnesses. The trial court has weighed this evidence and found it wanting. Where the determination of an issue in chancery is based upon conflicting evidence of such doubtful and unsatisfactory character, upon which judges might differ as to the conclusions to be drawn therefrom, the appellate court will not disturb a decree rendered by the trial chancellor in such case, even though it might have decided differently had it first decided the issue. *Ross* v. *McConnaughy*, 85 W. Va. 199; *Baughman* v. *Hoffman*, 90 W. Va. 388; *Crummett* v. *Crummett*, decided this term. On this principle, we are not disposed to reverse the decree, and it will be affirmed.

*Affirmed.*